Marcella Ann CROMLEY, Plaintiff,

v.

BOARD OF EDUCATION OF LOCKPORT TOWNSHIP HIGH SCHOOL DISTRICT 205; Donald E. Weber, individually and in his capacity as Superintendent of Lockport Township High School District 205; Richard J. Dittle, individually and in his capacity as Principal of Lockport Township High School District 205, East Campus; and Donald Meints, Defendants.

No. 87 C 9767.

United States District Court, N.D. Illinois, E.D.

Nov. 1, 1988.

---

Joan M. Eagle, Lawrence Jay Weiner, Cohen Starck & Weiner, Chicago, Ill., for plaintiff.

David P. Kula, Deborah W. Owens, Scariano Kula Ellch & Himes, Chicago Heights, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Defendants request that this court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, grant their motion to dismiss plaintiff's complaint. In such circumstances any inference drawn must be favorable to the plaintiff, *United Milk Products Co. v. Michigan Avenue National Bank of Chicago*, 401 F.2d 14, 17 (7th Cir.1968), and the allegations contained in the complaint are to be accepted as true. *National Van Lines, Inc. v. United States*, 326 F.2d 362, 372 (7th Cir.1964); 5 Wright, Miller & Cooper, Federal Practice and Procedure § 1363 at 656 (1969).

## FACTS

Viewing the complaint in the light most favorable to the plaintiff, the facts underlying this dispute appear as follows:

Plaintiff Marcella Ann Cromley ("Cromley") was employed as a reading instructor

by the Board of Education of Lockport Township High School District 205, Will County, Illinois (the "Board") from the 1974–75 school year up to and including the 1977–78 academic year, at the District's Central Campus. For the 1978–79 school year the Board selected Cromley to be the Reading Department Chairperson/Chapter 1 Director upon the recommendation of defendant Donald Weber ("Weber"), then principal of the East Campus and now superintendent of District 205. Cromley had been reappointed to this position every year through the 1986–87 school year.

In December 1986 two female students informed Cromley that defendant Donald Meints ("Meints"), a reading teacher employed by the Board at the East Campus, had kissed them and another female student. They also described how Meints on several occasions had rubbed their necks and shoulders in a way that offended them and that he had also made sexually-offensive comments. Cromley considered each of these described incidents unprofessional and sexual harassment. Later that month, Cromley informed the principal of East Campus, defendant Richard J. Dittle ("Dittle"), of the students' complaints. Dittle had the school social worker interview the complaining students, after which he personally interviewed them. The social worker told Dittle that the girls had in fact complained about Meints, and the social worker added that she too had heard complaints from students that Meints rubbed their shoulders in a way they thought sexual and offensive. Dittle confirmed to Cromley that the students had reiterated their complaints to him and added that they told him of Meints' kissing them as he slid his hand down their buttocks.

Dittle discussed the matter with Meints without informing the Illinois Department of Children and Family Services ("DCFS") of the students' complaints or describing the discussion. Dittle also failed to place a report in Meints' personal file. On February 12, 1987, Cromley called the DCFS herself. She reported the facts concerning the allegations of the two students and gave her name. Five days later DCFS representatives came to District 205 to investigate Cromley's complaint but Dittle refused to allow Cromley to speak with them.

On March 4, 1987, Cromley noted the students' allegations in her yearly performance evaluation of Meints executed pursuant to her duties as Reading Department chairperson. Meints rebutted Cromley's evaluation in writing ("the rebuttal") and at a meeting on March 16, 1987, distributed it to Dittle, the American Federation of Teachers' ("AFT") president, an AFT grievance committee member, Meints, and Cromley. Around the time of the meeting Meints showed additional representatives of the AFT his rebuttal and informed other teachers of its contents. The rebuttal claimed that Cromley's evaluation was a "malicious, vindictive, vengeful attempt to discredit me both as a person and as an educator," that it was "rife with innuendos, insinuations, fabrications, and half-truths," and that "Cromley's remarks which, based on hearsay, were taken out of context, contorted, and made 'dirty' by a mind which is consumed with and obsessed with finding all references to women as sexually motivated" (cplt. ¶ 15). The rebuttal also stated that, "perhaps I should sympathize with a person who looks at everything in such a jaded, contorted, twisted manner." *Id.* Meints also told other teachers that Cromley had made an anonymous telephone call reporting him to the DCFS.

Subsequent to Cromley's telling Dittle that she intended to seek legal advice with respect to the statements being circulated about her, Dittle met with Weber on March 27, 1987. Although Cromley had been previously told that she would be maintained in her current positions, Dittle informed her that, beginning with the 1987–88 school year, the Reading Department was being merged into the English Department and, as a result, the position of Reading Department chairperson was being eliminated.

Cromley's yearly evaluations from 1982–83 through 1985–86 described her work as "exemplary," "excellent," "effective," "very good job," "on top of her field," and recommended her for reappointment for each subsequent year (cplt. ¶ 19). Crom-

ley's 1986–87 evaluation noted problems with personnel in the Reading Department but contained no remarks with respect to reappointment.

In April 1987 Cromley applied for the position of Gifted Coordinator and Chapter 1 Coordinator, in response to the posted notice of the opening. On May 1 she was told that the position was awarded to Steven Midlock, an individual whom Cromley alleges "was not as qualified for the position" as herself (cplt. ¶ 22). Weber recommended Midlock to the Board for the position of Chapter 1 coordinator, but the appointment failed because of a tie vote. Thus, on May 21 the position was reposted, and Cromley and Midlock both reapplied.

The same day on which Cromley reapplied, May 26, she asked Weber for a written account of the reasons why she was not reappointed as Chapter 1 Director for the 1987–88 academic year. Weber responded the next day with a writing which included, among other comments, that "[a]t no time were your qualifications for this position viewed in a negative fashion; as a matter of fact, quite to the contrary, your past commitment to this program and completion of the tasks at hand have been thorough and supported by Chapter 1 review team evaluations" (cplt. ¶ 28). During the summer of 1987 Midlock accepted employment in another school district. Other than Cromley, Midlock was the only applicant for the Chapter 1 Coordinator position. In early July the Board posted the position of English Department Chairperson, without mentioning the Chapter 1 Coordinator vacancy.

Cromley wrote a "Response to March 16, 1987, 'Rebuttal to Evaluation of 3/4/87 by Ms. Cromley'" ("the response") dated July 15, 1987. Cromley attached exhibits and requested that the administration place a copy in Meints' personnel file. Dittle refused this request.

On July 15, 1987, notice was posted for the position of Associate English Department Chairperson. Cromley subsequently filed an application for the position in which she argued that the responsibilities of the Chapter 1 Coordinator would blend well with those of the Associate English Department Chairperson. Though Cromley was the only applicant from within District 205, she was notified on August 12 that another person was recommended for the associate chairperson position. On August 18 the Board, on Weber's recommendation, hired Carol Garrett as an English teacher and appointed her Associate English Department Chairperson. Garrett was previously not a teacher in District 205 and Cromley alleges that "Garrett was not as qualified" for the position as herself (cplt. ¶ 40).

A special meeting of the Board, held on July 25, appointed Sandra Martin English Department Chairperson and Chapter 1 Coordinator. Cromley contends that Martin "was not as qualified for the Chapter 1 position" as herself (cplt. ¶ 37) and also that Martin had not timely applied for the position pursuant to the May 1987 posting.

Cromley brought suit alleging, *inter alia,* that Weber, Dittle, and the Board of Education knew or reasonably should have known that their actions and conduct in (1) eliminating the Reading Department; and/or (2) not reappointing Cromley to the Chapter 1 Director position; and/or (3) not recommending Cromley for the then vacant Chapter 1 Director position; and/or (4) not recommending Cromley for the Associate English Department Chairperson position, violated Cromley's First and Fourteenth Amendment freedoms. Plaintiff alleges causes of action pursuant to 42 U.S.C. § 1983 against the Board, against Weber and Dittle individually and in their respective official capacities, and against Meints. She also alleges that Weber and Dittle conspired together to bring about these same ends. Cromley submits pendent state claims for defamation, retaliatory action, intentional interference with contractual relations and intentional infliction of emotional distress.

## DISCUSSION

### I. SECTION 1983 CLAIMS

Plaintiff's counts I through III state claims under the First and Fourteenth

Amendments to the U.S. Constitution and thereby under 42 U.S.C. § 1983. Section 1983 prohibits persons acting under color of state law from depriving any person of any rights, privileges or immunities secured by the Constitution or federal law. Thus plaintiff must have pled both that there were the requisite actions under color of state law and that she was thereby denied a protected right.

Plaintiff apparently seeks damages in count I from the Board/County; in counts II and III she alleges the liability of particular individuals (the former concerning Dittle, the latter, Weber);[1] and in count IV the conspiracy charge is detailed.

### A. Deprivation of a Protected Right— Cromley's Speech

To state her claim under § 1983 plaintiff must allege that defendants retaliated against her on the basis of protected speech. That public employees do not relinquish their First Amendment rights as a condition of employment is beyond dispute. Equally clear is that in order to create an environment conducive to educating students, certain restrictions on the speech of public school teachers are necessary. What is therefore required is "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The fear that post-hoc judicial evaluation might effectively prevent school boards from acting on internal matters wholly irrelevant to speech led the Supreme Court in *Mt. Healthy City Board of Education v.*

*Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977), to create a test which protects both teachers and school boards. *Mt. Healthy* holds that the plaintiff-teacher must demonstrate that his or her conduct was protected by both the First and Fourteenth Amendments, and also that such conduct played a substantial part in the decision not to rehire. *Id.* at 285–86, 97 S.Ct. at 575–76. Once that demonstration is made the burden shifts to the board to demonstrate by a preponderance of the evidence that it would have reached the same decision even in the absence of the "protected conduct." *Id.* at 285–87, 97 S.Ct. at 575–76. We employ the same test here where the plaintiff alleges not that she was fired but rather that she was victimized by other forms of retaliation.

■ The First Amendment protects speech that addresses issues of "public concern," as opposed to matters of "personal interest." *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1982). Protected speech includes employee expression which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. at 1690.

■ Plaintiff here alleged sufficient facts to bring her speech within the ambit of First Amendment protection. Cromley informed Dittle about student complaints, reported them to the DCFS[2] and reiterated them in her yearly performance evaluation of Meints.[3] Allegations that Meints had taken sexual liberties with his students are of obvious concern to the community of Lockport. *See, e.g., Kufalk v. Hart*, 610 F.Supp. 1178, 1183 (N.D.Ill.1985) (holding plaintiff's oral criticism of defendants' "application and interpretation of regulations concerning the prevention of abuse" of dis-

---

1. Defendants are correct that "[a]s to Count 1, Plaintiff's allegations are vague and confusing" (def. mem. at 2). The problem is that count I includes each and every background fact of concern. Both this court and defendants have had to ascertain count I's scope via the context surrounding counts II and III.

2. Whether the Abused and Neglected Child Reporting Act ("ANCRA"), ch. 23, § 2051 *et seq.* then compelled reporting to the DCFS is irrele-

vant to whether or not Cromley's speech is constitutionally protected. To suggest otherwise would place the legislature, who decides when reporting is legally required, in control of the First Amendment's scope.

3. Private communications are also afforded constitutional protection. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

abled clients to be of public concern and therefore constitutionally protected).

■ Defendants also allege that the *Pickering* balancing test renders Cromley's speech unprotected because Dittle had a "compelling interest in beginning to restore the working relationships and in resuming regular operations" (defendants' motion in support of motion to dismiss (hereafter "def. mem.") at 4). Whether the state's interest herein outweighs Cromley's interest in speaking on a matter of public concern is impossible to evaluate at this time. As previously mentioned, this court's inquiry does not go beyond the scope of the plaintiff's complaint wherein plaintiff alleges that the elimination of the reading department and her not being recommended for and/or appointed to other positions, were *solely* in retaliation for her exercise of constitutional and statutory rights. Furthermore, defendants recite no workplace efficiency justifications for the alleged retaliation (merging the departments and denying her subsequent applications) which might serve to explain the aforementioned actions and perhaps outweigh Cromley's speech interests.[4] Defendants merely justify Dittle's concluding his investigation in a way unsatisfactory to Cromley. They do not address the crux of Cromley's claim —that not only was no disciplinary action taken against Meints, but also that Cromley herself was the subject of retaliation.

■ The second relevant issue is whether the defendants' conduct was a "substantial factor" in precipitating plaintiff's damages. The first *Mt. Healthy* inquiry, ascertaining whether the plaintiff's speech was protected, is answered affirmatively above. And with regard to the second inquiry, plaintiff also sufficiently alleges that protected conduct was a substantial factor in

the actions by the Board, Dittle and Weber which led to her damages. For example, at ¶ 43 the complaint avers:

> *Because of* the aforesaid protected conduct and actions of Cromley, the Board of Education, upon the recommendations of Dittle, eliminated the Reading Department, thus eliminated the position Cromley held as Reading Department Chairperson. Weber and Dittle refused and/or failed to recommend to the Board of Education that Cromley be reappointed as Chapter 1 Director and/or appointed as Associate English Department Chairperson, and the Board of Education did not reappoint or appoint Cromley to said positions, *all in retaliation for* her exercise of and in violation of the aforesaid constitutional and statutory rights.

(Emphasis added.) Thus, the second inquiry is satisfied and plaintiff has thus pled allegations sufficient to meet *her* burden under *Mt. Healthy*. The remainder of the test—that the defendants must demonstrate that their actions would have been taken nonetheless—is irrelevant to defendant's Rule 12(b)(6) motion.[5]

### B. *Color of State Law*

To state a claim under § 1983 plaintiff must allege that the defendants acted under "color of state law." This court finds plaintiff's allegations sufficient. Almost by definition the Board of Education acted under color of state law. And, with regard to Dittle and Weber "the plaintiff describes each defendant and his official position. This is sufficient to support the inference in a motion to dismiss that defendants acted under color of state law." *Marshall v. Spangler*, 397 F.Supp. 200, 202 (W.D.Va. 1975).

---

**4.** For example, in *Connick* the Court upheld the employee's dismissal:

> Connick's judgment, and apparently also that of his first assistant Dennis Waldron, who characterized Myers' actions as causing a "mini-insurrection," was that Myer's questionnaire was an act of insubordination which interfered with working relationships. When close working relationships are essential to fulfilling public responsibilities, a wide degree

> of deference to the employer's judgment is appropriate.

461 U.S. at 151–52, 103 S.Ct. at 1692–93.

**5.** Nothing in this opinion should be taken to suggest that this court foresees that the defendants will not be able to meet this burden. The conclusion here is merely that the complaint survives the scrutiny appropriate to a motion to dismiss.

## C. Board/County Liability

■ The Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held that a local municipal body may be held liable for its own constitutional violations under 42 U.S.C. § 1983 and may not be sued under a theory of *respondeat superior*. Under this standard local municipal bodies may be sued "for constitutional deprivations visited pursuant to governmental 'custom.'" *Id.* at 690–91, 98 S.Ct. at 2035–36. And such policies or customs need not be reduced to writing:

> Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a "custom or usage" with the force of law.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970), *quoted in Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.

Even given the liberal boundaries of notice pleading in the context of a motion to dismiss, "a section 1983 plaintiff must do more than merely parrot the language of *Monell* or copy conclusory language from assorted decisions of other courts in which *Monell*-type claims have been upheld." *Hamrick v. Lewis*, 515 F.Supp. 983, 986 (N.D.Ill.1981). To satisfy this pleading obligation, plaintiff contends that where the *defendant is a decision-making body* a single decision may be sufficient under *Monell*.[6]

The Supreme Court's decision in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), held that, in some circumstances, municipal liability may be imposed for a single decision. The Court therein evaluated the basis for *Monell*:

> ... The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.
>
> With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.
>
> \* \* \* \* \* \*
>
> ... If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Id.* at 479–81, 106 S.Ct. at 1299. Thus, as the policymaking body to whom Lockport delegated authority as to educational staffing questions, the board of education is liable not on a *respondeat superior* theory but because of their unique position.[7] *See*

---

6. Plaintiff also contends that the alleged *multiple decisions* made by the Board which operated to damage Cromley are sufficient to establish a policy or custom under *Monell*. The court need not reach this issue given its holding that the Board's position as ultimate decisionmaker with regard to the decisions affecting Cromley suffices under *Monell*.

7. Clarification was provided in *Pembaur's* footnote 12:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar *decisions with respect to law enforcement* practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability.

*Kingsville Independent School District v. Cooper*, 611 F.2d 1109 (5th Cir.1980) (holding school district liable for the actions of its board in firing a teacher because the only way the district could act was through its board of trustees); *see also Stoddard v. School District*, 590 F.2d 829 (10th Cir. 1979) (holding school district liable for the actions of its board in failing to renew a teacher's contract because the district had acted through its board of trustees).[8] Thus, assuming as correct the complaint's allegations that the Board retaliated against Cromley for exercising her constitutionally-protected rights (cplt. ¶ 43), *Monell* would not bar relief. Because the school board is the official policymaker, liability is not precluded.

### D. *Individual Capacity Liability*

■ Defendants Weber and Dittle contend that there is insufficient nexus between their actions and Cromley's damages because they did not have the requisite ability to discharge [9] or appoint employees. Yet this court is duty bound to hold the individual defendants liable for their own actions. Both Dittle and Weber are alleged to have intentionally made retaliatory recommendations which effectively operated to Cromley's detriment (cplt. ¶¶ 47(e), 46(e)).[10] Such allegations are more than sufficient to meet the bad faith standard of *Hutto v. Finney*, 437 U.S. 678, 700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522 (1978). The extent to which these actions contributed to the plaintiff's alleged damages is a question of fact inappropriate for determination at this time. Were plaintiff's allegations proven correct—that but for Weber and Dittle's retaliation her damages would have been avoided—she would be entitled to relief. Thus, as a matter of law, plaintiff alleges claims against both Weber and

Dittle, individually, upon which relief can be granted.

### E. *Official Capacity Liability*

The action against Weber and Dittle in their official capacities is another way of alleging school district liability. The complaint makes it plain, however, that the school board was the decisionmaker. If it, encouraged by Weber and Dittle, retaliated against plaintiff, then the school district is liable. If it did not retaliate but was, rather, misled by Weber and Dittle, then the school district would not be liable although Weber and Dittle may personally be answerable for a constitutional tort. The suit against Weber and Dittle in their official capacities adds nothing in those circumstances. Cromley's claim against them in their official capacities is dismissed.

### F. *Conspiracy*

■ In order to establish a *prima facie* case of conspiracy plaintiff must allege an agreement by two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means. This court need not address the sufficiency of plaintiff's allegations as to whether an agreement existed, nor need it evaluate whether defendants committed the requisite overt act. Instead, this court holds that the conspiracy allegations fall within the intracorporate conspiracy doctrine articulated in *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir.1972).

In *Dombrowski*, Judge (now Justice) Stevens applied antitrust's intracorporate conspiracy doctrine to § 1985 civil rights actions:

> ... We also believe that the statutory requirement that "two or more more persons ... conspire or go in disguise on the

475 U.S. at 483, 106 S.Ct. at 1300 (emphasis in original). The actions which Cromley alleges to have been retaliatory, eliminating the Reading Department and denying her subsequent applications, clearly are decisions of the Board.

8. Because the defendant at issue is the Lockport Board of Education itself and not the school district, the justification for liability is even more compelling.

9. Defendants presumably intend "discharge" to include control over the elimination of departments with the consequent "discharging" of the former chairpersons.

10. Counts II and III both have paragraphs numbered 45–48. The textually cited paragraph numbers correspond to those actually in the complaint.

highway," is not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm.

\* \* \* \* \* \*

... But if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by [§ 1985(3)].

*Id.* at 196. Because this court finds the Seventh Circuit's intracorporate conspiracy doctrine equally applicable to the individual defendants at bar, and the school board, we answer negatively the question left open in *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 830 (7th Cir.1975), *cert. denied,* 425 U.S. 943, 96 S.Ct 1683, 48 L.Ed.2d 187 (1976) ("we do not reach the issue whether a determination of policy by an institute and its executives can be a 'conspiracy' within the meaning of [§ 1985(3)]"), as it relates to conspiracies to violate § 1983.

Weber and Dittle's ability to injure Cromley derived solely from their positions within the school district and the influence they wielded therefrom. They had no ability, as individuals, to affect Cromley's employment position. Thus, within the meaning of *Dombrowski,* as pronounced and defined by the Seventh Circuit,[11] plaintiff's proper causes of action have already been alleged in counts I through III; the conspiracy count would "appear to add nothing in terms of defendant's liability." *Walker v. Woodward Governor Co.,* 631 F.Supp. 91, 95 (N.D.Ill.1986).

Invoking *Stathos v. Bowden,* 728 F.2d 15 (1st Cir.1984), plaintiff contends that the numerous acts committed in furtherance of the alleged conspiracy render the intracorporate conspiracy doctrine inapplicable. Yet, as long as merely one entity is involved this court fails to see how multiplication creates addition—how the frequency with which the plaintiff's rights were allegedly violated can impact on the conspiracy

issue. We cannot resolve this "conceptual difficulty." *Coley v. M & M Mars, Inc.,* 461 F.Supp. 1073, 1077 (M.D.Ga.1978); *see also Weaver v. Gross,* 605 F.Supp. 210, 214–215 (D.D.C.1985). Count IV is therefore dismissed.

### G. *Damages*
#### 1. Injury to Reputation

Defendants concede that injury to reputation is compensable where constitutional rights are deprived. Because the plaintiff adequately alleges that defendants retaliated against her exercise of First Amendment freedoms, her claim for injury to reputation cannot be dismissed at this time.

#### 2. Mandamus

■ Plaintiff's allegation that the Reading Department was eliminated in retaliation for her constitutionally-protected speech is insufficient justification for plaintiff's plea for mandamus. Plaintiff urges, without citation, that reinstatement via mandamus is appropriate where individuals allege retaliation for exercising their First Amendment rights. Courts have held backpay to be an insufficient remedy because it does not rectify the chilling effect created by retaliation. *See, e.g., Banks v. Burkich,* 788 F.2d 1161, 1164 (6th Cir.1986) ("The prospect of money damages will not be sufficient for many employees to overcome the otherwise chilling effect that accompanies the threat of termination"). But courts have more general equitable powers with which to address the problem: we can order reinstatement without the use of mandamus. *See, e.g., Reeves v. Claiborne County Bd. of Educ.,* 828 F.2d 1096 (5th Cir.1987); *see also Banks v. Burkich, supra.* Thus mandamus would be inappropriate here.

#### 3. Qualified Immunity

■ *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981) sets out the criteria by which to determine whether particular conduct of officials is shielded by immunity. Such immunity is

---

**11.** This court cannot, as plaintiff urges, reject the Seventh Circuit's longstanding application of the intracorporate conspiracy doctrine beyond its antitrust origins.

available to individual defendants "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. In the case at bar plaintiff has sufficiently alleged that the individual defendants—Dittle and Weber—acted in "reckless or callous disregard of, or indifference to, said [constitutional] rights," and that they "knew or reasonably should have known" that their retaliatory actions violated Cromley's First Amendment freedoms (cplt. at ¶¶ 44, 47, 48.)[12] Whether the Abused and Neglected Child Reporting Act's scope reached school personnel is irrelevant. Plaintiff's constitutionally-protected speech consisted of informing Dittle about student complaints, reporting them to the DCFS and reiterating them in Meints' yearly performance evaluation. *See supra* I.A. and accompanying notes. No one disputes defendants' contentions that they "are entitled to exercise their discretion in hiring, within the bounds of Illinois and contract law" (def. mem. at 9–10). We would merely add that this discretion is also subject to the constraints imposed by the federal Constitution and statutory law. Because plaintiff's contentions are sufficient to meet the

*Harlow* standard, dismissal on the basis of qualified immunity is inappropriate.

### 4. Punitive Damages

 The defendants contend, without further explanation, that the Board is immune from punitive damages under § 1983. Suffice it to say, this is a drastic oversimplification of a very complex part of § 1983 litigation. The assertion is correct insofar as it applies exclusively to the punitive damage claim against the Board itself. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).[13] With regard to Weber and Dittle, in their individual capacities, punitive damages are available if their conduct resulted from "reckless or callous disregard for the plaintiff's rights, as well [as from] intentional violations of federal law". *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983). The plaintiff has pled reckless disregard of and indifference to her First Amendment rights, and therefore her allegations are sufficient to avoid Rule 12(b)(6) dismissal of the punitive damages claim; the issue can, of course, be revisited after discovery on a motion for summary judgment. *See, e.g., Kufalk v. Hart,* 610 F.Supp. 1178, 1191 (N.D.Ill. 1985).[14]

---

**12.** To reiterate, counts II and III both have paragraphs numbered 45–48 and the textually cited paragraph numbers correspond to those actually used in the complaint.

**13.** As is explained *infra* at note 15, the Board's freedom from punitive damage claims described in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), applies only to *direct* actions against the Board and not to litigation arising out of the Board's indemnification of officials.

**14.** The Seventh Circuit's *Kolar v. County of Sangamon of State of Ill.* opinion, 756 F.2d 564 (1985), isn't as succinct as defendants implicitly suggest, nor as sweeping as plaintiff contends. In *Kolar* the court permitted a plaintiff in a § 1983 action to recover punitive damages from the county. After noting the general rule that "local public entities are immune from punitive damage awards in civil rights actions," the court held that the Illinois Local Government and Governmental Employees Tort Immunity Act ("the Tort Immunity Act"), Ill.Rev.Stat. ch. 85, ¶ 9–102 (1983), waived the county's common law immunity from the $100 punitive damage claim awarded plaintiff Kolar. Cromley asserts

that *Kolar* stands for the proposition that "the Board's immunity from liability for punitive damages was waived by state law when Illinois enacted the Local Government and Governmental Employees Tort Immunity Act") (pl. mem. in oppos. to def. mo. to dis. at 17–18). We find that conclusion misleading. *Kolar* decided only that the Tort Immunity Act waived the county's exposure as an indemnitor, leaving intact the common law immunity from punitive damages articulated in *City of Newport,* in actions brought directly against local public entities. *See also Bell v. City of Milwaukee,* 746 F.2d 1205, 1271 (7th Cir.1984) (holding that the well-established policy of municipal immunity from punitive damages precluded plaintiffs from recovering punitive damages absent indemnification, but rejecting the contention that such immunity precluded indemnification of the punitive damages awarded against the individual defendants). Thus defendants are correct insofar as *Kolar* supports their contention that the defendant board is absolutely immune from punitive damages. The holding does not, however, impact on the exposure of the individuals. Nor does this immunity preclude Board indemnification.

## II. PENDENT CLAIMS

### A. *Libel and Slander* [15]

The complaint sets out three allegedly libelous passages or remarks for which plaintiff seeks damages. The first two of these are contained in Meints' rebuttal to Cromley's evaluation; one portrays the evaluation as a personal assault while the other attacks Cromley's personality as being preoccupied with sexual innuendoes. The complaint also contends that Meints and Dittle defamed Cromley by telling others that her call to the DCFS was made anonymously. Cromley contends that these passages and remarks, because they allegedly impute an inability or lack of integrity in the discharge of her employment duties and injure her in her profession as a teacher and administrator, fall within the categories of libel and slander *per se.* She also alleges what amounts to special damages—that as a result of the alleged defamatory statements she lost and/or didn't receive various positions.[16]

 Words are libelous *per se* if they are "so obviously and naturally hurtful to the person aggrieved that proof of their injurious character can be dispensed with." *See, e.g., Quilici v. Second Amendment Foundation,* 769 F.2d 414, 417–18 (7th Cir. 1985), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). Two of the four categories of words which constitute libel *per se* under Illinois law are alleged in this case. Cromley alleges that Meints' words both "impute an inability to perform, or want of integrity in the discharge of

duties of an office or employment" and also prejudice her in "her profession or trade." *See, e.g., Quilici,* 769 F.2d at 417 (citations omitted).

 The first allegedly defamatory remark from Meints is contained in the initial paragraph of his rebuttal to Cromley's evaluation:

I feel it necessary to take this opportunity to offer a rebuttal to the evaluation of my teaching which was completed by Ms. Cromley on March 3, 1987; a document that I can only view as a malicious, vindictive, vengeful attempt to discredit me both as a person and as an educator. The observation and evaluation report is rife with innuendos, insinuations, fabrications, and half-truths which certainly serve no good purpose.

(Cplt. exh. B at 1). Initially, these comments consist merely of Meints' opinions as to the nature of Cromley's initial evaluation.[17] Taken as a whole, this passage reflects Meints' opinion as to both the content of the evaluation as well as his explanation of why it was written as it was. While Meints' comments are hardly ambiguous, they are not "capable of objective verification"—the average person would not infer that they had a "factual context"—and the broader context of the whole rebuttal "signals that the statement" is opinion. *See Ollman v. Evans,* 750 F.2d 970, 979 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *see also Stevens v. Tillman,* 661 F.Supp. 702, 708 (N.D.Ill.1986).[18] Such

**15.** For the sake of simplicity, this court uses "libel" to refer to both its traditional meaning as well as that previously associated with "slander" because "Illinois law no longer recognizes any substantive differences between the two causes of action." *American Pet Motels, Inc. v. Chicago Veterinary Medical Association,* 106 Ill.App.3d 626, 629 n. 1, 62 Ill.Dec. 325, 328 n. 1, 435 N.E.2d 1297, 1300 n. 1 (1st Dist.1982). We also use "defamation" to impart the same meaning.

**16.** Cromley alleges that "[a]s a result of Meints and Dittle's defamatory statements, Cromley has suffered the loss of her position as Reading Department Chairperson/Chapter 1 Director, loss of appointment to the position of Associate English Department Chairperson, other injury

to and loss of reputation in her profession, and severe emotional distress" (cplt. at ¶ 59).

**17.** The sole example of a factual misrepresentation is plaintiff's claim that Meints and Dittle stated her phone call was made anonymously (pls. mem. at 29).

**18.** Plaintiff invokes *Stewart v. Chicago Title Insurance Co.,* 151 Ill.App.3d 888, 104 Ill.Dec. 865, 503 N.E.2d 580 (4th Dist.1987), for the proposition that expressions of opinion can nonetheless be actionable where "it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Id.* at 15 Ill.App.3d at 891, 104 Ill.Dec. at 867, 503 N.E.2d at 582, *quoting* the Restatement (second) of Torts § 566 (1977). But this court fails to see how Meints' opinion

opinions are constitutionally protected: "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1973). Additional speech, *e.g.*, Cromley's response to Meints' rebuttal, would therefore seem to be the appropriate remedy.[19] As a matter of law, therefore, this passage is beyond the reach of libel law. *See Ollman*, 750 F.2d at 979. Moreover, these remarks do not suggest that Cromley is incapable of effectively executing her duties as an evaluator of her co-teachers; Meints maintains that this particular document was an "attempt to discredit me both as a person and as an educator." "Although harsh and uncomplimentary, these words amount to criticism of the plaintiff's conduct in a particular instance and not a personal attack on the plaintiff's honesty or character in general." *Britton v. Winfield Public Library*, 101 Ill.App.3d 546, 549, 57 Ill.Dec. 100, 102, 428 N.E.2d 650, 652 (2d Dist. 1981). Thus an action for libel *per se* cannot be maintained on these remarks.

■ The second allegedly defamatory remark from Meints is contained in the seventh paragraph of his rebuttal:

> Ms. Cromley's remarks about "unprofessional sexual comments" are remarks which, based on hearsay, were taken out of context, contorted, and made "dirty" by a mind which is consumed with and obsessed with finding all references to women as sexually motivated.

(Cplt. exh. B at 2.) While these comments seem much closer to crossing the line, we nonetheless hold them not libelous. When taken as a whole, Meints' rebuttal attempts to refute Cromley's allegations with respect to his teaching. The above passage is Meints' attempt to explain why Cromley could be so incorrect in her evaluation. Thus, taken in context of the whole rebuttal, these comments are more opinion and thus not actionable. Furthermore, it is far from clear that Meints' comments *obviously and naturally* harm Cromley in her profession or impute an inability to perform or lack of integrity in discharging the duties of her job. As a department chairperson, Cromley evaluates the teaching abilities of her subordinates. This court can, with a bit of imagination, contemplate situations in which Cromley's alleged "dirty" mind might create an inability to perform her work well. Her ability to evaluate fairly male teachers might, for example, be called into question. But the standard is strict: the harm contemplated must obviously and naturally result. This not being the situation at bar, plaintiff's libel *per se* claim cannot survive defendant's motion to dismiss.

■ The third allegedly defamatory remark was purportedly uttered by both Meints and Dittle. Cromley alleges that "Meints told other teachers that Cromley made an anonymous telephone call reporting him to DCFS" (cplt. ¶ 16) and that "Dittle made statements to various administrators and teachers that Cromley made an anonymous telephone call to DCFS concerning Meints" (*id.* at ¶ 53). Plaintiff claims not only that both Dittle and Meints knew she had given her name, but also that the allegations of anonymity were "false and slanderous, imputing an inability or lack of integrity by Cromley in the discharge of her employment duties and injuring Cromley in her position as a teacher

---

could be interpreted as being informed by undisclosed facts uniquely within his knowledge. Further, the detailed nature of the rebuttal, that for five pages Meints rebuts each allegation contained in Comley's initial evaluation, strongly suggests that he has held nothing back.

**19.** In fact, Cromley's response of July 15 directly confronts Meints' allegations:

> The use of emotional, pejorative terms, "malicious, vindictive, vengeful," as a preface to your "rebuttal" reflects your feelings about my character but provides no explanation,

either explicit or implicit, as to *WHY* I would allegedly endeavor to "discredit" you as a person or educator. Your introductory paragraph establishes the climate for the remainder of the rebuttal—an angry assault upon my character and an assault upon my evaluation, which you characterize as "rife with innuendoes, [sic], and half-truths." In fact, I find nothing substantive in your rebuttal as to why my factual observations were incorrect.

(Cplt. exh. D at 1 (emphasis in original).)

and administrator" (*id.* at ¶ 54). For the purposes of ascertaining whether these comments were libelous *per se,* Cromley's interpretation of these accounts is irrelevant. The operative legal question is whether the comments are "so obviously and naturally hurtful to the person aggrieved that proof of their injurious character can be dispensed with." *Quilici,* 769 F.2d at 417–18. Mischaracterizing as anonymous the reporting of another teacher to the DCFS cannot possibly meet this standard. That the plaintiff herself views "anonymous calls to anyone as contemptible behavior" (cplt. exh. C at 9) is irrelevant. Thus, this last remark, like the two passages of Meints' rebuttal discussed above, cannot be characterized as libel *per se.*

Finally, this court doubts that it has jurisdiction to decide whether plaintiff's claim that she suffered damages as a result of Meints' and Dittle's defamatory statements sufficiently alleges special damages to constitute a cause of action for libel *per quod.* Jurisdiction of this court is premised on her § 1983 allegations—that in retaliation for her exercising constitutionally-protected rights she suffered damages. She cannot simultaneously maintain and seek to prove, for the purposes of her pendent libel claim, that these identical damages were instead caused by the libelous remarks of Meints and Dittle and not by a constitutional tort. Because Cromley cannot maintain an action for libel *per se,* and because, in the absence of persuasive authority to the contrary, this court believes that it is without jurisdiction to hear the pendent libel *per quod* cause of action, count V is dismissed.[20]

### B. *Retaliatory Action*

In *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (Ill.1978), the Supreme Court of Illinois joined the growing number of states which have recognized the tort of retaliatory discharge. The court in *Kelsay* found that the public policy furthered by the workers' compensation system would be frustrated if employees could be fired for filing worker's compensation claims. The court concluded that "we are convinced that to uphold and implement this public policy a cause of action should exist for retaliatory discharge." 74 Ill.2d at 181, 23 Ill.Dec. at 563, 384 N.E.2d at 357.[21]

The contours of "public policy" were explored in *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (Ill.1981). *Palmateer* dealt with plaintiff's allegations that he was discharged for supplying information that a Harvester employee might be violating the Criminal Code to a local law enforcement agency, for agreeing to gather further evidence implicating the employee, and for intending to testify at the resulting trial. The court conceded that "[n]o specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime," but nonetheless held that "public policy nevertheless favors citizen crime-fighters." 85 Ill.2d at 132, 52 Ill.Dec. at 17, 421 N.E.2d at 880. The Supreme Court of Illinois thus reversed Harvester's motion to dismiss and the case was returned to the circuit court for further proceedings.

Defendants allege that, prior to January 1, 1987, the Abused and Neglected Child Reporting Act ("ANCRA") pertained only to alleged abuse by persons in a child's living environment. They therefore claim that plaintiff states no valid public policy basis for her actions. We disagree with defendant's interpretation of the pre–1987 scope of the Act. While P.A. 84–1318, approved September 3, 1986 and effective on January 1, 1987, explicitly inserted "education personnel" among the group of persons responsible for the child's welfare whose abuse or neglect would require reporting, the conclusion that such individuals were not covered by the Act prior to the

---

20. As plaintiff has failed to make out a jurisdictionally acceptable cause of action, there is no need for this court to examine the various immunity issues.

21. Similar concerns are raised where retaliation short of discharge serves to frustrate public policy. Consequently, we find the retaliatory discharge case law applicable to the instant allegation.

amendments is far from clear. P.A. 84–1318 removed a catchall provision—"any other person responsible for the child's care at the time of the alleged abuse or neglect"—and instead inserted a particularized list:

> ... any person responsible for the child's welfare within a public or private profit or not for profit child care facility; or any other person responsible for the child's welfare at the time of the alleged abuse or neglect, including but not limited to health care professionals, *educational personnel*, recreational supervisors, and volunteers or support personnel in any setting where children may be subject to abuse or neglect.

1986 Ill.Laws 2764, Ill.Rev.Stat. ch. 23, ¶ 2053 (emphasis added). Thus, it seems as if Cromley was required by ANCRA, both before and after amendment, to report Meints' alleged abuse; she would seem to fall within the general provision as well as within the particularized list. Furthermore, since 1980 the Illinois School Code has threatened a one-year suspension of one's teaching certificate for "willful failure to report an instance of suspected child abuse or neglect as required by the 'Abused and Neglected Child Reporting Act,' as now or hereafter amended." 1984 Ill.Laws 2028, Ill.Rev.Stat. ch. 23, ¶ 2054. At a minimum, this provision, which was fully operative at the time of Cromley's actions, suggests that the reporting of alleged child abuse furthered public policy. And as a tool for interpreting whether Cromley was *compelled* to report the children's allegations, this provision can only be construed to suggest that teachers were required to report alleged child abuse under threat of losing their teaching certificates long before the 1986 amendments.

This court has little difficulty in characterizing Cromley's actions as in furtherance of public policy. The mere existence of the ANCRA at the time of Cromley's actions demonstrates the importance which society has placed on the reporting of child abuse. Like the plaintiff in *Palmateer* who supplied evidence to the authorities and agreed to continue to aid in the investigation and prosecution though not legally compelled to do so, Cromley's efforts furthered the enforcement of child abuse laws.

The issue is not resolved, however, once we conclude that public policy is furthered by reports under the ANCRA. Defendants allege rather curtly that the Northern District of Illinois has concluded that plaintiffs with potential § 1983 claims are not allowed to simultaneously pursue retaliatory claims. No matter how unpersuasively presented, we evaluate the relevant doctrine.

Going back to the origins of the state law cause of action, courts have held that "the Illinois Supreme Court seems willing to recognize the tort of retaliatory discharge when to do so would further the policy goals stated in *Kelsay*." *Busa v. Barnes*, 646 F.Supp. 615, 617 n. 4 (N.D.Ill.1986) (citations omitted). Plaintiff suggests that because her state claim is founded on an Illinois statute it furthers different goals than the § 1983 actions. But this focus misses the *raison d'etre* for the retaliatory cause of action. *Kelsay* and its progeny are concerned with affording relief to otherwise remediless plaintiffs. The court in *Kelsay* feared that the workmen's compensation scheme would be undermined were employers permitted to threaten the termination of those employees who sought compensation: "We cannot ignore the fact that when faced with such a dilemma many employees, whose common law rights would have been supplanted by the Act, would choose to retain their jobs, and thus, in effect, would be left without a remedy either common law or statutory." 74 Ill.2d at 182, 23 Ill.Dec. at 563, 384 N.E.2d at 357. *Busa* dismissed plaintiff's state retaliatory discharge claim because the "§ 1983 claim will provide vindication of the policies behind the First Amendment and Article 1, §§ 4 and 5 of the Illinois Constitution." 646 F.Supp. at 618. And in *Gutierrez v. City of Chicago*, 605 F.Supp. 973 (N.D.Ill. 1985), the court dismissed the retaliatory discharge claim because "[b]oth Title VII and 42 U.S.C. § 1983 provide causes of action for wrongful discharge based on political activity or on racial discrimination." *Id.* at 980.

These cases are not determinative, however, for it is very possible that the state law claim might further either different policy goals than those furthered by the § 1983 claim or the same goals to an even greater degree.[22] This, and not the basis for each claim, is the controlling issue.

■ We hold that § 1983 appears sufficient to vindicate plaintiff's rights. It can be argued that the ANCRA's concern is with child abuse and the First Amendment with free speech. In the case at bar, however, enforcement of the latter ensures successful protection of the former.[23] This court has already held that plaintiff's reports pursuant to the ANCRA are protected speech under the First and Fourteenth Amendments. Thus, such actions—which are necessary to further the public policies behind the ANCRA—are already protected as speech, and suppression thereof is enforceable under § 1983. We therefore dismiss the plaintiff's retaliatory discharge claim contained in count VI and need not reach the issue as to whether mandamus would be appropriate relief.

## C. *Intentional Interference with Contract and Employment Relations.*

■ Illinois law clearly describes the essential elements for an action alleging the tort of intentional interference with contractual relations. They are the existence of a valid and enforceable contract

between the plaintiff and another, defendants' awareness of the contract, defendants' intentional and unjustified inducement of a breach of that contract, a subsequent breach of the contract by the third party caused by the defendants' action, and damages. *See, e.g., Richmond v. Hahn,* 134 Ill.App.3d 947, 948, 90 Ill.Dec. 143, 144, 481 N.E.2d 943, 944 (3rd Dist.1985).

Even after viewing the complaint "liberally with a view to doing substantial justice between the parties," *id.,* this court is at a loss in its attempt to locate the requisite contract between the plaintiff and another. There obviously was no contract with regard to the positions for which Cromley applied. And we find nothing in the complaint to suggest that the Board was in breach of a contract with respect to the Reading Department position. Plaintiff's allegation that the "Board of Education reappointed Cromley to said position every year thereafter through the 1986–87 school year" (cplt. ¶ 8), strongly suggests that her position as chairman was evaluated annually. No matter how strongly Cromley felt that she deserved the subsequent appointment, she had no contractual right to it. Also irrelevant is that she expected reappointment, even where this expectation would be considered reasonable. Count VII alleges interference with contractual relations, not expectations, and thus must be dismissed. If the present complaint omits relevant facts to the exist-

---

**22.** The state law claim might, for example, permit punitive damages where the federal claim does not. *See, e.g., Midgett v. Sackett–Chicago, Inc.,* 105 Ill.2d 143, 85 Ill.Dec. 475, 473 N.E.2d 1280 (Ill.1985). By raising the penalty the state law claim adds deterrence and therefore furthers the public policy goals beyond the level attainable via litigation on the federal claim alone. And the state law claim may permit a unique remedy without which, according to state law, plaintiff's recovery would be considered incomplete. *See Midgett,* 105 Ill.2d at 149, 85 Ill.Dec. at 479, 473 N.E.2d at 1284 ("[i]f there is no possibility that an employer can be liable in punitive damages, not only has the employee been afforded an incomplete remedy, but there is no available sanction against a violator of an important public policy of this State").

**23.** Plaintiff is correct that *Brudnicki v. General Electric Company,* 535 F.Supp. 84 (N.D.Ill.1982)

is not controlling. The *Brudnicki* court argued that the remedies established under the federal law—42 U.S.C. § 2000e–3 (1976)—were exclusive. Thus the court refused to "imply an independent [state] cause of action in this context." *Id.* at 89. Because § 1983 claims are not statutorily prescribed to be exclusive, the *Brudnicki* case is not binding. Nonetheless, the case is instructive to see how the court looked beyond the plaintiff's characterization of the policies allegedly furthered by the federal and state actions. The court instead concluded that "[p]laintiff's argument advances a distinction without a difference. ... The theoretical policy against being compelled to violate these laws is subsumed by the underlying policy against employment discrimination. If plaintiff were permitted to maintain an independent tort on such dependent grounds, the remedies provided by state and federal law would have no meaning." *Id.*

ence of a contract for the position of chairman, we invite the plaintiff to amend.

Further, this and many other courts have explored what amounts to a corporate officer exception to the tort of intentional interference with contractual relations. *See, e.g., Allen Saltzman Associates, Inc. v. Aileen, Inc.,* 633 F.Supp. 1161, 1163 (N.D. Ill.1986); *Medina v. Spotnail, Inc.,* 591 F.Supp. 190, 196 (N.D.Ill.1984). "Corporate officers are not outsiders intermeddling maliciously in the business affairs of the corporation. They are privileged to act on behalf of their corporations, using their business judgment and discretion." *George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 F.2d 1326, 1333 (7th Cir.1983). These same considerations of deference in the context of agency law are applicable in the case at bar. Here the superintendent of the district and the principal of Central Campus are alleged to have interfered with a contract (*see above*) between the Board and the plaintiff. But the superintendent and the principal are the academic reflection of corporate officers and are therefore privileged to act on behalf of the Board.

The limits to the exception are similarly derived from agency law:[24] "[W]hen the action is detrimental to the corporation and outside the scope of corporate authority, immunity ceases to exist." *George A. Fuller,* 719 F.2d at 1333. The considerations relevant to the inquiry are as follows:

> Illinois law requires—to state a cause of action against corporate officers for interfering with their corporate principal's

contract—the allegation of facts which, if true, establish that the officers induced the breach to further their personal goals, or to injure the other party to the contract, *and* acted contrary to the best interest of the corporation.

*Id.; Medina,* 591 F.Supp. at 196 (emphasis in original). Plaintiff has sufficiently alleged that Dittle and Weber acted to injure Cromley, but she has not alleged facts which suggest that their actions were contrary to the best interests of the Board. Nor has she alleged that the actions benefitted Dittle or Weber personally. Remembering that the only conceivable claim as to the existence of a contract would be an allegation that there was a contract between Cromley and the Board pertaining to her chairmanship of the Reading Department, the plaintiff has failed to demonstrate either that merging the Reading Department into the English Department was detrimental to education or that it benefitted Dittle and Weber personally.[25] In the absence of those allegations they were legally incapable of interfering with whatever contract could be alleged to have existed between the Board and Cromley.

### D. *Intentional Infliction of Emotional Distress*

To state a cause of action for the tort of intentional infliction of emotional distress, plaintiff must allege facts which demonstrate that (1) defendants' conduct was extreme and outrageous; (2) plaintiff's emotional distress was severe; and (3) defendants' conduct was such that they knew that

---

**24.** Plaintiff uses the language of *Ramsey v. Greenwald,* 91 Ill.App.3d 855, 47 Ill.Dec. 150, 414 N.E.2d 1266 (2nd Dist.1980), to contend that the defendant was not acting on behalf of the principal because "he did not have the power to hire or fire" the plaintiff. *Id.* at 91 Ill.App.3d at 863, 47 Ill.Dec. at 156, 414 N.E.2d at 1272. In the very next line, however, the court conceded that "the submission of reports regarding Ramsey's performance may have been a task that was within the scope of his employment." *Id.* Thus, the filing of reports by Weber and Dittle and their making recommendations were on behalf of the school board. Though the court in *Ramsey* eventually held that the defendant was not acting with the best interests of the principal in mind, we hold *infra* that the plaintiff

herein has not alleged facts sufficient to make a comparable demonstration.

**25.** It is important to remember that Cromley does not allege wrongful discharge from employment. That distinguishes this case from *Kufalk v. Hart,* 610 F.Supp. 1178, 1192 (N.D.Ill. 1985), wherein the court was willing to infer that the dismissal of the plaintiff was contrary to the interests of the school. *Id.* at 1192 ("From the duration of his tenure alone, this court can infer the plaintiff was a valuable asset to his employer"). We are unable to make the same inference with regard to the more general policy decisions of the school board, for example, whether it was beneficial to consolidate two departments.

severe emotional distress would be certain or substantially certain to result. *See, e.g., Smith v. Metropolitan Life Insurance Company,* 550 F.Supp. 896, 901 (N.D.Ill. 1982). Defendants herein contend both that plaintiff has not alleged facts suggesting that their conduct was extreme or outrageous, and also that plaintiff similarly has failed to allege that defendants knew their conduct would create emotional distress.

 Paragraphs 70 and 71 of the complaint sufficiently state the requisite allegations as to the nature of the defendants' conduct and their knowledge:

70. The actions and conduct of Weber, Dittle, Meints, and the Board of Education were extreme and outrageous, were intentionally calculated to and did inflict emotional distress upon Cromley, and resulted in Cromley's need to seek medical attention.

71. Weber, Dittle, Meints, and the Board of Education knew that their actions and conduct with respect to Cromley were extreme and outrageous and would inflict emotional distress upon Cromley.

Prior to discovery, this court is reluctant to resolve the conflicting allegations as to the nature of defendants' conduct and knowledge. We take the allegations contained in ¶¶ 70 and 71 to be true and thus hold that the elements of the intentional infliction of emotional distress claim are sufficiently alleged.

Defendants further contend that there must be an allegation that a physical injury or illness was suffered. In support of this proposition they cite *Goldberg By and Through Goldberg v. Ruskin,* 128 Ill. App.3d 1029, 84 Ill.Dec. 1, 471 N.E.2d 530 (1st Dist.1984), *aff'd,* 113 Ill.2d 482, 101 Ill.Dec. 818, 499 N.E.2d 406 (Ill.1986), a case which considered the tort of *negligent* infliction of emotional distress. With respect to the *intentional* infliction tort there is considerable authority to the contrary. *See, e.g., McCaskill v. Barr,* 92 Ill.App.3d 157, 159, 47 Ill.Dec. 211, 212, 414 N.E.2d 1327, 1328 (4th Dist.1980) ("Illinois, unlike some other jurisdictions, does not require physical injury or disability to accompany, or result from, the psychic trauma"). Furthermore, the plaintiff has alleged that the actions of the defendants "did inflict emotional distress upon Cromley, and resulted in Cromley's need to seek medical attention" (cplt. at ¶ 70). For Rule 12(b)(6) purposes, this court finds this allegation sufficient to constitute the requisite physical injury. If defendants are correct that "[p]laintiff's feeble attempt to obfuscate the true facts must fail" (def. mem. at 21), it will wilt in the light of discovery as well.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted with respect to counts I–III (§ 1983), as applied to Weber and Dittle's liability in their official capacities; count IV (conspiracy); count V (defamation); count VI (retaliatory action); and count VII (intentional interference with contract). Defendants' motion is denied with respect to counts I–III (§ 1983), as applied to the Board of Education, Meints, and Weber and Dittle in their individual capacities, and count VIII (intentional infliction of emotional distress).