**Clyde J. COPELAND, Plaintiff,**

v.

**NORTHWESTERN MEMORIAL HOSPITAL, et al., Defendants.**

**No. 96 C 1270.**

United States District Court, N.D. Illinois, Eastern Division.

May 30, 1997.

Clyde J. Copeland, pro se.

Douglas Howard Momeyer, Hinshaw & Culbertson, Chicago, IL, for defendant Northwestern Memorial Hospital.

Patricia Jo Kendall, City of Chicago Law Department, Corporation Counsel, Susan Sher and George John Yamin, Jr., City of Chicago, Law Department, Chicago, IL, for defendant City of Chicago.

James Michael Kuhn, U.S. Attorney's Office, Chicago, IL, for defendants Lee Harbaugh and Abel Pena.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court are numerous motions by the parties in this case. Defendants Northwestern Memorial Hospital, the City of Chi-

cago, Abel Pena, and Lee Harbaugh have brought motions to dismiss plaintiff Clyde Copeland's complaint. Plaintiff Clyde Copeland has brought motions related to various discovery requests, for production of transcripts, for issuance of a subpoena, to substitute parties of interest, and for summary judgment. For the reasons that follow, the court grants defendants' motions to dismiss, and strikes some and denies some of Copeland's motions as set forth below.

## I. BACKGROUND [1]

Early in the morning on March 3, 1994, plaintiff Clyde Copeland suffered a stressful encounter that resulted in a panic attack, so he took his prescribed anxiety medication, Xanax. Copeland then blacked out. The next thing Copeland remembered occurred seven or eight hours later and miles away; he was running north on LaSalle Street in downtown Chicago.

At the moment Copeland's cognizance returned, he was having memories of robbing or attempting to rob the Harris Bank at the Board of Trade in downtown Chicago on four occasions in 1981, 1982, and 1983. Copeland's mood was vacillating between disorientation and hopelessness, agitation and fear, anxiousness and melancholy. For relief, Copeland went on a cocaine binge that lasted until the next day.

When Copeland's binge was over, his distraught mood returned. So, in the late afternoon on March 4, 1994, Copeland presented himself at the emergency room at Northwestern Memorial Hospital ("Northwestern" or "the hospital"), seeking psychiatric intervention and treatment and admission to the hospital. A nurse interviewed Copeland prior to his admission. He told her that he was frightened after coming down from his cocaine binge and wanted to speak with a psychiatrist. He also told her that he recently had been released from the psychiatric unit at Illinois Masonic Hospital in Chicago, and gave her the names of his doctor there and the medications he was taking.

When the nurse asked Copeland how much cocaine he had consumed, Copeland told her

---

1. The following facts are taken from the Complaint.

about $1,400 worth. The nurse asked where Copeland got the money to buy the cocaine, and he replied, "I don't know. Yesterday I had a blackout after taking my Xanax and when I came to I had the money. That's why I'm so scared—I don't know what happened yesterday."

The nurse then referred Copeland to an admissions clerk to complete the necessary paperwork for hospital admission. After Copeland was finished, the nurse again asked him how he got the money for the cocaine. He said that he did not remember. The nurse asked Copeland if he ever had committed any crimes, and Copeland responded that he was a convicted felon. The nurse asked Copeland about the last crime he had committed; he told her it was a bank robbery at the Board of Trade building at LaSalle and Jackson in Chicago. The nurse told Copeland that that was all she needed and that a doctor should be available soon.

After a long wait, Copeland began to feel extremely anxious and asked the nurse if she had a cigarette. She did not but told a security guard to find Copeland a cigarette. When Copeland walked outside the emergency room to smoke, the nurse had the security guard accompany him. A little while later, the nurse told Copeland that the doctor was available and that the security guard would escort Copeland to the doctor.

The security guard took Copeland to his office, where he told Copeland that Copeland had to submit to a strip search. Copeland protested, stating that it seemed like he was being arrested. The guard explained that because Copeland was going to be admitted to a psychiatric ward, he had to submit to the search for everyone's safety, including his own, and that the search was hospital policy. Copeland then consented to the search.

The guard then escorted Copeland to a locked observation room, which could be opened only from the outside. At one point while Copeland was in the observation room, a doctor entered with six to eight students, and asked Copeland if he would answer some questions. Copeland agreed. Copeland recounted his recent status as a psychiatric patient at Illinois Masonic, his blackout the day before, his cocaine binge, and the ex-

treme emotions that precipitated Copeland's presentment to Northwestern.

The doctor stated that the nurse told him that Copeland had robbed the bank at the Board of Trade, which Copeland acknowledged. The doctor then asked Copeland if that was how he got his money to buy cocaine. Copeland replied that he did not know; that he could not remember what he did for several hours the previous day; and that he already had the money when his memory returned. The doctor reframed and asked again the questions about Copeland's criminal past, but Copeland answered as before. The doctor and students then left the observation room, the doctor telling Copeland on his way out that Copeland would be put in the psychiatric unit soon, and that when he got there, he and the doctor would talk about his medication.

Some time later, the nurse entered the observation room with two Chicago police officers. The officers handcuffed Copeland without speaking to him. One of the officers asked the nurse if Copeland was on any medication or had any medical or psychiatric conditions that would require special handling. She replied, "We haven't done anything with him but hold him for you."

The officers took Copeland from the hospital and brought him to the police station. During the ride, one officer said that they had a long night ahead of them, interrogating Copeland and typing up the reports of the investigation. The other officer replied that this was the easiest duty they could have received, because that night they were just "errand boys for the Feebees," meaning the Federal Bureau of Investigation ("FBI"). The first officer asked for the arrest warrant from the "feds" to go along with his report. The second officer replied that they did not need a warrant, since this was not their "collar," and that all they had to do was hold Copeland overnight.

At the police station, Copeland was photographed and fingerprinted and placed in a cell. The next morning, March 5, 1994, the Chicago police transferred custody of Copeland to Lee Harbaugh, special agent for the FBI. Harbaugh handcuffed Copeland's hands

in front of him and placed Copeland in the front seat of Harbaugh's car. Harbaugh removed his jacket and got in the car. His weapon was holstered on his right side and was accessible to Copeland, making Copeland fear that Harbaugh was tempting Copeland to make an escape attempt. As Harbaugh began driving, Copeland began fidgeting in his seat. Harbaugh said he wished that Copeland would try it. Harbaugh then said, "If you don't cooperate with me I might just kill you. You see we can do anything we want with you. You're nothing. A nigger and a nut. Who'll care if we lose you? Nobody. I'll be a hero. Go ahead, try it." Copeland did not respond for fear of provoking Harbaugh to kill him.

At FBI headquarters, Harbaugh took Copeland to a large room with rows of desks and handcuffed him to a desk chair. Harbaugh placed a rights waiver in front of Copeland and demanded that he sign it. Copeland ignored Harbaugh's demands. Harbaugh then appeared to lose his temper and placed a sharp object against Copeland's throat, saying, "I'll cut your throat if you don't cooperate." When Copeland refused to respond, Harbaugh scraped Copeland's throat, causing abrasions to it. Copeland still did not respond.

After Harbaugh verbally and physically assaulted Copeland for about an hour and a half, FBI agent Abel Pena arrived. Pena examined the abrasions on Copeland's throat and asked Harbaugh how they got there. Harbaugh told Pena that "Sambo" probably got them while in the city lock-up, and that they were probably his "love bites." After several hours, Pena asked Copeland if he was hungry and went for food. While Pena was gone, Harbaugh resumed harassing Copeland, saying, "You're a nigger, a non-entity, nobody. You're a convicted bank robber ... of the same bank that was robbed two days ago and you look like the perp. Case closed."

Copeland was brought before a magistrate judge, charged by information with bank robbery, and ordered detained pending a psychiatric competency evaluation. Harbaugh and Pena brought Copeland to the Metropolitan Correctional Center ("MCC"). While wait-

ing for Copeland to be admitted to the MCC, Harbaugh examined the contents of Copeland's wallet, and then put the wallet and its contents into his pocket. Copeland told him to make sure that those items were left with the MCC. Harbaugh then jumped out of the car, opened the rear passenger door, pulled Copeland out of the vehicle, and slammed him face down on the concrete. Harbaugh kept him in this position by placing his foot on Copeland's neck, holding him in that position for 15 to 20 minutes while awaiting permission to enter the MCC.

Once inside the MCC, Harbaugh continued to manhandle Copeland, even throwing him against a wall, in the presence of two correctional officers. After learning of Harbaugh's treatment of Copeland and seeing Copeland's throat abrasions and cuts, a lieutenant at the MCC photographed Copeland's injuries and refused to accept him at the MCC without a statement from a hospital that Copeland's medical condition was stable. Harbaugh and Pena drove Copeland to Cook County Hospital and had him examined and medically cleared. During the drive to and from Cook County Hospital, Harbaugh continued to say things like, "They're only doing this because those niggers are looking out for their own;" and "One of these days the shoe's going to be on the other foot."

Copeland remained in custody from March 4, 1994, until recently. He was convicted of bank robbery, to which he pleaded guilty, and was sentenced to 48 months' imprisonment. It appears that Copeland is no longer in prison as of the time the court writes this opinion.

On March 4, 1996, Copeland filed a six-count complaint in this court, based on the incidents of March 4 and 5, 1994. Copeland alleges violations of 42 U.S.C. §§ 1985(3) (Count One), 1985(2) (Count Two), 1981 (Count Three), and 1983 (Count Four) against Northwestern, the City of Chicago ("the City"), Pena, Harbaugh, and unknown police officers, nurse, and physicians; a violation of 42 U.S.C. § 1986 (Count Five) against the City, Harbaugh, Pena, and unknown police officers; and medical malpractice under state law (Count Six) against Northwestern and the unknown nurse and physicians.

Northwestern, the City, Pena, and Harbaugh now move to dismiss Copeland's claims against them. Copeland, in turn, has filed numerous motions of his own.

## II. *DISCUSSION*

### A. *Copeland's motions*

#### 1. Discovery requests

■ Copeland has filed six motions asking for leave to participate in discovery. Because Copeland does not need leave from the court to ask defendants to provide initial disclosures, produce documents, or admit facts, *see* FED.R.CIV.P. 26, 34, and 36, the court strikes Copeland's motions for leave to file requests for initial disclosures, production of documents, and admissions.

#### 2. Enlargement of time

Copeland moves for an enlargement of time to respond to Northwestern's motion to strike and dismiss. Because Copeland already has responded to Northwestern's motion, his motion for enlargement of time is moot and therefore is stricken.

#### 3. Issuance of subpoena

Copeland moves for issuance of a subpoena for medical records of two psychiatrists who treated him. Because the court will not accept these records in lieu of an affidavit that must accompany Copeland's medical malpractice claim, as the court explains fully in section II.B.7. below, the court need not issue a subpoena for the medical records. Accordingly, this motion is denied.

#### 4. Summary judgment

Copeland moves for summary judgment as to defendant Abel Pena. Because the court finds that Copeland has failed to state claims against Pena, as explained below, it denies his motion for summary judgment.

#### 5. Production of transcripts

Copeland moves for production of transcripts from his change of plea hearing in Case Number 94 CR 143, before Judge Plunkett on December 13, 1995. Copeland contends that these transcripts may have evidentiary value to this court in passing upon defendants' motions to dismiss. That may be so. However, in deciding the motions to dismiss, the court does not look at evidence but merely considers the allegations in the complaint. *See* FED.R.CIV.P. 12(b)(6); *Cromley v. Board of Educ. of Lockport,* 699 F.Supp. 1283, 1285 (N.D.Ill.1988); *Gomez v. Illinois State Board of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). Consequently, the court has no need for the transcripts, and denies Copeland's motion asking for them.

#### 6. Substitution of parties

■ Finally, Copeland moves to substitute parties of interest. In this motion, Copeland asks the court to allow him to substitute Officer Delponti and Officer Tracy for the "two unknown named Chicago police officers" named in his complaint. The court construes this motion as one to amend his complaint to name the proper defendants. Ordinarily, the court would grant such a motion. However, it would be futile to do so here, because Copeland cannot add new parties to his lawsuit.

Copeland filed his lawsuit on March 4, 1996, two years to the day after the alleged wrongful actions by defendants occurred. The statutes of limitations applicable to all of Copeland's claims except his section 1986 claim provided a two-year period for Copeland to file his claims. *See Cathedral of Joy Baptist Church v. Village of Hazel Crest,* 22 F.3d 713, 716–17 (7th Cir.1994) (section 1983); *Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769, 774 (N.D.Ill.1993) (sections 1981 and 1985); 735 ILCS 5/13–212(a) (medical malpractice). Section 1986 contains its own statute of limitations of one year. 42 U.S.C. § 1986.

Thus, Copeland filed his complaint on the last day that he could have done so. He did not attempt to name the proper police officer defendants until December 2, 1996, when he filed his motion to substitute parties. Copeland now seeks to add two new defendants to his case long after the applicable limitation period has passed. The only way Copeland can add the new defendants after the limitation period has expired is pursuant to the

relation back doctrine codified in Federal Rule of Civil Procedure 15(c).

Rule 15(c) provides that an amendment changing or adding parties relates back to the date of the original pleading if (1) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading; and, (2) within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by the amendment (A) has received notice of the action such that he will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a *mistake* concerning the identity of the proper party, the action would have been brought against the party. FED.R.CIV.P. 15(c) (emphasis added).

As the emphasis above shows, Rule 15(c) has a mistake requirement, which the Seventh Circuit construed in *Wood v. Worachek*, 618 F.2d 1225 (7th Cir.1980):

"... . [A]mendment with relation back is generally permitted in order to correct a misnomer of a defendant where the proper defendant is already before the court and the effect is merely to correct the name under which he is sued. *But a new defendant cannot normally be substituted or added by amendment after the statute of limitations has run.*

. . . .

Rule 15(c)(2) [current Rule 15(c)(3)] permits an amendment to relate back only where there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake, but *it does not permit relation back where, as here, there is a lack of knowledge of the proper party.*"

*Worthington v. Wilson*, 8 . F.3d 1253, 1256 (7th Cir.1993) (quoting *Wood*, 618 F.2d at 1229, 1230 (citation omitted)) (emphasis added).

In *Worthington*, the plaintiff filed his section 1983 lawsuit on the last day before the limitation period on his claim was to run, naming "three unknown named police officers" and the Village of Peoria Heights as defendants. *Worthington*, 8 F.3d at 1254. Plaintiff later filed an amended complaint substituting two police officers identified by name in place of the "unknown named police officers." *Id.* at 1255. The district court dismissed the two officers on the ground that the two-year statute of limitations had expired, and the amendment did not relate back to the filing of the original complaint under Rule 15(c). *Id.*

The Seventh Circuit affirmed the district court's ruling. It found that the plaintiff's failure to name the police officers in his first complaint was due to a lack of knowledge of their identities, and not to a mistake about their correct names. *Id.* at 1256–57. Consequently, the plaintiff could not avail himself of the relation back doctrine of Rule 15(c). *Id.* at 1257.

■ The facts of *Worthington* are analogous to the relevant facts in the present case. Here, Copeland filed his first complaint on the last day before the limitation period applicable to his claims expired. In that first complaint, Copeland named "two unknown named Chicago police officers" as defendants because he did not know their true identities. He did not learn of their identities until October 2, 1996. (*See* Mot. to Substitute Parties of Interest.) On December 2, 1996, he first sought to add the proper defendants, Officers Delponti and Tracy, as defendants.

■ Because Copeland's failure to name Officers Delponti and Tracy in his first complaint was due to his lack of knowledge of their identities, and not due to a mistake as to their names, he cannot avail himself of the relation back doctrine of Rule 15(c). *See Worthington*, 8 F.3d at 1257. Without the relation back doctrine, Copeland cannot now add Officers Delponti and Tracy as defendants because " 'a new defendant cannot normally be substituted or added by amendment after the statute of limitations has run.' " *Id.* at 1256 (quoting *Wood*, 618 F.2d at 1229, 1230).

Accordingly, the court denies Copeland's motion to substitute parties of interest.

## B.  *Defendants' motions to dismiss*

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Cromley v. Board of Educ. of Lockport,* 699 F.Supp. 1283, 1285 (N.D.Ill.1988). If, when viewed in the light most favorable to the plaintiff, the complaint fails to state a claim upon which relief can be granted, the court must dismiss the case. *See* FED.R.CIV.P. 12(b)(6); *Gomez v. Illinois State Board of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). However, the court may dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### 1.  Unknown defendants

■ In addition to naming Northwestern, the City, Pena, and Harbaugh, Copeland sued "an unknown named emergency room registered nurse," "two unknown named emergency room physicians," and "two unknown named Chicago police officers." As the court discussed above in the context of Copeland's motion to substitute parties, Copeland later learned the identities of the unknown police officers and sought to substitute them as defendants, but the court denied his request. Thus, the unknown nurse, physicians, and police officers remain parties, at least until now.

■ Claims against unknown persons are "meaningless and uncompensable." *Collier v. Rodriguez,* No. 96 C 0023, 1996 WL 535326, *4 (N.D.Ill. Sept.18, 1996). Accordingly, the court dismisses with prejudice the unknown nurse, physicians, and police officers as party defendants.

### 2.  Count One—Section 1985(3)

Section 1985(3) provides a cause of action to an individual where two or more persons have conspired to deprive the individual of the equal protection of the laws, or of equal privileges and immunities under the laws. 42 U.S.C. § 1985(3).

In Count One, Copeland alleges: (1) that Harbaugh and Pena conspired to deprive Copeland of equal protection of the laws by causing his unlawful seizure by Northwestern and the unknown nurse and physicians [2] because of his race; (2) that Harbaugh and Pena conspired to deprive Copeland of equal privileges enjoyed by white citizens in the making and enforcement of contracts when Northwestern and the nurse and physicians pretended to admit Copeland to the hospital for psychiatric treatment but in fact arrested and detained Copeland without probable cause or an arrest warrant because of his race; (3) that Harbaugh and Pena conspired to deprive Copeland of equal protection and due process of the laws by causing the City, through its police officers, unlawfully to deprive Copeland of his liberty without an arrest warrant or any type of judicial process because of his race; and (4) that Harbaugh conspired with Pena to deprive Copeland of equal protection of the laws and equal privileges and immunities under the laws when Harbaugh verbally, physically, and emotionally abused Copeland because of his race.

While Count One appears to be directed only at Harbaugh and Pena, it also indirectly accuses Northwestern and the City of wrongdoing. Therefore, the court will read Count One as alleging section 1985(3) violations against all defendants.

■ A civil conspiracy under section 1985 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage. *Lenard v. Argento,* 699 F.2d 874, 882 (7th Cir.) (quotations omitted), *cert. denied,* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). Thus, to establish a *prima facie* case of civil conspiracy under section 1985, a plaintiff must show an express or implied agreement among the

---

**2.** Although the court has dismissed the unknown defendants from the case, the court will include them in relating Copeland's allegations for the sake of accuracy and completeness in describing Copeland's claims.

defendants to deprive the plaintiff of his constitutional rights, and a deprivation of those rights in the form of overt acts in furtherance of the agreement. *Scherer v. Balkema,* 840 F.2d 437, 441 (7th Cir.), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *Chicago Miracle Temple Church, Inc. v. Fox,* 901 F.Supp. 1333, 1347 (N.D.Ill. 1995).

█ Moreover, allegations and proof of a racial animus underlying the conspiracy are required to maintain a section 1985(3) conspiracy claim.[3] *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). That is, the alleged conspirators must have intended to discriminate against the plaintiff and thereby deprive him of equal protection or equal privileges and immunities because of his race. *See id.*

█ It is not enough for a section 1985 plaintiff to plead mere conclusory allegations of a conspiracy. Rather, the plaintiff must plead specific material facts that show the existence of a conspiracy. *See Winterland Concessions Co. v. Trela,* 735 F.2d 257, 262 (7th Cir.1984) ("[c]onclusory pleadings of a conspiracy must be dismissed"); *Jafree v. Barber,* 689 F.2d 640, 644 (7th Cir.1982) (allegations of a conspiracy "must be supported by material facts, not conclusory statements"); *Lewis v. Green,* 629 F.Supp. 546, 552 n. 6 (D.D.C.1986) (quoting *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944)) (" '[w]ith near unanimity, the courts have rejected complaints containing only conclusory allegations of conspiracy under [section 1985(3) ]' ").

█ Copeland has not alleged any facts indicating that Northwestern or any of its agents or employees entered into an agreement with Harbaugh, Pena, Chicago police officers, or anyone else with the goal of depriving Copeland of his constitutional rights because of his race. It was Copeland who went to Northwestern's emergency room for treatment and who asked to be admitted to the hospital. Later, Chicago police officers took custody of Copeland, and still later,

transferred custody to Harbaugh and Pena. These allegations simply are insufficient to show that any meeting of the minds occurred between Northwestern and the various defendants to deprive Copeland of his constitutional rights.

Furthermore, Copeland has alleged no facts to indicate that a racial animus underlay Northwestern's alleged conspiracy against Copeland. Copeland simply tacks on the phrase "because of plaintiff's race" to each of his contentions in Count One. But in the body of his complaint, where Copeland describes the events of March 3 through 5, 1994, Copeland alleges no facts showing any kind of racial animus on the part of Northwestern or its agents or employees against Copeland. Therefore, Copeland has not alleged the essential elements of a section 1985(3) claim against Northwestern.

█ As with Northwestern, Copeland has failed to allege facts showing that the City had any agreement with any other person to deprive Copeland of his constitutional rights because of Copeland's race, and that the City, through its police officers, bore any racial animosity towards Copeland. Accordingly, Copeland has failed to state a claim under section 1985(3) against the City of Chicago.

█ As to Pena, Copeland makes conclusory allegations that he and Harbaugh conspired to deprive Copeland of his constitutional rights. However, in the body of the complaint, Copeland fails to allege any facts that bear out his conclusion. In fact, Copeland alleges facts that indicate that Pena had no role in any actions taken against Copeland except to examine his neck for abrasions, get him food, and accompany Harbaugh in taking Copeland to the MCC.

If anything, Copeland's allegations indicate that Pena was somewhat concerned about Copeland's welfare, and that Pena was not present during the alleged wrongdoing by Harbaugh. Thus, the complaint actually undermines Copeland's claim concerning a conspiracy involving Pena. Furthermore, as with

---

**3.** Allegations and proof of racial animus are required only for causes of action brought under the first part, or first two clauses, of section

1985(3), of which this is one. *See Kush v. Rutledge,* 460 U.S. 719, 726, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413 (1983).

Northwestern and the City of Chicago, Copeland fails to allege any facts that indicate that Pena held any racial· animosity towards Copeland. Accordingly, Copeland has failed to state a claim under section 1985(3) against Pena.

Copeland makes numerous and specific factual allegations against Harbaugh regarding Harbaugh's physical and verbal abuse of Copeland because of Copeland's race. If the allegations are true, Harbaugh's conduct was egregious and reprehensible. However, other than conclusory and unsupported allegations that Harbaugh and Pena conspired to deprive Copeland of his constitutional rights, Copeland has not alleged facts to indicate that Harbaugh entered into any conspiracy to arrest or detain Copeland unlawfully or to abuse Copeland physically and psychologically because of his race. If Harbaugh took any of the alleged actions against Copeland because of his race, Copeland's allegations indicate that he did so on his own, and not in concert with anyone else. Accordingly, Copeland has failed to allege a claim under section 1985(3) against Harbaugh.

Because Copeland has failed to state a section 1985(3) claim against Northwestern, the City, Pena, and Harbaugh, the court dismisses Count One against them. However, because it is conceivable, though unlikely, that Copeland can amend his complaint to state a section 1985(3) claim against the defendants, the dismissal is without prejudice.

### 3. Count Two—Section 1985(2)

■■■■ Section 1985(2) provides a cause of action to an individual where two or more persons have conspired to deter the individual from attending or testifying in federal court or for the purpose of impeding, hindering, obstructing, or defeating the due course of justice with the intent to deprive the individual of equal protection of the laws. 42 U.S.C. § 1985(2). Section 1985(2) has two components: the first proscribes conspiracies to interfere with litigation in federal court;

the second proscribes conspiracies to obstruct the course of justice in state courts. *See Kush v. Rutledge,* 460 U.S. 719, 722, 103 S.Ct. 1483, 1485–86, 75 L.Ed.2d 413 (1983).[4]

In Count Two, Copeland alleges that: (1) the unknown nurse, physicians, and police officers and Northwestern conspired to impede, hinder, obstruct, and defeat the due course of justice by refusing psychiatric and medical treatment to Copeland, with the purpose of depriving him of his constitutional right to mount a criminal defense; .and (2) Harbaugh and Pena conspired to impede, hinder, obstruct, and defeat the due course of justice by allowing Harbaugh to terrorize Copeland verbally, physically, and emotionally in an attempt to elicit a bank robbery confession, even though Copeland had no memory of the events or time.

■■■ As with section 1985(3), Copeland was required to allege at least some facts to support the existence of a conspiracy in Count Two. He has failed to do so. Copeland alleges no facts showing that the nurse, physicians, police officers, and Northwestern either agreed or planned together to obstruct justice by refusing Copeland psychiatric and medical treatment, with the purpose of depriving him of his constitutional right to mount a criminal defense. Moreover, Copeland's allegations indicate that Copeland was not refused treatment but rather received at least some treatment at the hospital. Finally, Copeland's· complaint is devoid of any factual allegations to support his conclusory statement, which borders on the preposterous, that the defendants' actions were motivated by an intent to prevent Copeland from mounting a criminal defense.

Copeland has failed to allege facts indicating that the nurse, physicians, police officers, and Northwestern agreed to engage in actions designed to prevent Copeland from attending or testifying in federal court or to obstruct justice in state court by depriving Copeland of equal protection of laws. Ac-

---

**4.** Unlike section 1985(3), racial or otherwise class-based animus is not required to establish a cause of action for conspiracy to interfere with the administration of justice in federal courts pursuant to the first clause of section 1985(2), but is required to establish a cause of action under the second clause of section 1985(2), regarding obstruction of justice in state courts. *See generally Kush,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413. Copeland's action arises under the first clause, since his prosecution occurred in federal court.

cordingly, Copeland has failed to state a claim under section 1985(2) against Northwestern.

■ Similarly, Copeland has failed to allege facts showing that Harbaugh and Pena agreed to obstruct justice through Harbaugh's alleged verbal, physical, and emotional abuse of Copeland in an attempt to elicit a bank robbery confession from Copeland. Copeland has alleged no facts showing any kind of agreement between Pena and Harbaugh to violate Copeland's rights by eliciting an illegal confession from him. In fact, Copeland's complaint clearly alleges that Pena was not present during most of the alleged wrongful acts by Harbaugh and that when Pena was present, he did not participate in any of the wrongful acts.

Moreover, Copeland's complaint is devoid of allegations that the purpose of the purported conspiracy between Harbaugh and Copeland was to prevent Copeland from attending or testifying in court or to obstruct justice with the intent to deprive Copeland of equal protection of the laws. Copeland simply alleges in conclusory fashion, with no factual elaboration or support, that this was the intent of the alleged conspiracy.

■ Although Copeland is proceeding *pro se,* he still is required to allege some facts in support of his conspiracy claim before the court will deem his conspiracy allegations to state a claim. *See Tarkowski v. Robert Bartlett Realty Co.,* 644 F.2d 1204, 1208 (7th Cir.1980). He has failed to do so in Count Two. Accordingly, the court dismisses Count Two against all parties. As with Count One, it is possible, though unlikely, that Copeland can amend his complaint to state a section 1985(2) claim. Therefore, the dismissal is without prejudice.

### 4. Count Three—Section 1981

Section 1981 " 'prohibits racial discrimination in the making and enforcement of private contracts.' " *Patterson v. McLean Credit Union,* 491 U.S. 164, 171, 109 S.Ct. 2363, 2369–70, 105 L.Ed.2d 132 (1989) (quoting *Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976) (citing *Johnson v. Railway Express Agency,*

*Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975); *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.,* 410 U.S. 431, 439–40, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973))).

Count Three alleges that all defendants deprived Copeland of the full and equal enjoyment of services, facilities, privileges, advantages, and accommodations, including the right to make and enforce contracts, that are enjoyed by white citizens. Specifically, Copeland alleges that all defendants violated his privacy rights under the free speech clause of the first amendment, the equal protection clause of the fourteenth amendment, the fourth amendment protection against unlawful search and seizure, and the due process and equal protection clauses of the fifth and fourteenth amendments by arresting him without a warrant and without probable cause solely because of his race.

■ The only rights protected by section 1981 are those relating to the making and enforcing of contracts. *See id.* The gist of Copeland's section 1981 claim appears to be that by arresting him without a warrant or probable cause solely because of his race, defendants infringed on Copeland's right to enter into a contract with Northwestern for medical and psychological treatment.

First, Copeland alleges no facts that indicate that any of the defendants took any of their actions because of Copeland's race. While he alleges in conclusory fashion that defendants arrested him without a warrant or probable cause because he is black, Copeland simply does not provide any factual allegations that support his conclusion, or from which even an inference of racial animus can be drawn. Similarly, Copeland does not allege facts that show that a white citizen in his position would have been treated differently, and would have enjoyed benefits and privileges of a contractual relationship of which Copeland was deprived because of his race. That is, Copeland alleges no facts indicating that a white person who presented himself at Northwestern for psychiatric treatment, and told the nurse that he had gone on a $1,400 cocaine binge but did not know where he got the money and that he had a criminal record for bank robbery,

would not have been treated in the same manner as Copeland was treated.

Copeland also fails to allege facts to show that he was deprived of the benefits and privileges of a contractual relationship because of defendants' arrest of him. He alleges no facts to indicate that he had a contractual relationship with Northwestern. For example, while Copeland alleges that he went to the hospital seeking admission and treatment, and filled out insurance forms prior to his admission, he provides no factual allegations that the hospital then was contractually bound to administer psychological or medical treatment to him.

Moreover, Copeland's complaint alleges that he received at least some treatment at the hospital. Thus, even if the hospital was bound contractually to treat Copeland, Copeland's complaint does not sufficiently allege that his arrest prevented the hospital from fulfilling its contractual obligations.

As with his other claims, Copeland fails to allege sufficient facts to support his conclusory statements in Count Three. Accordingly, Count Three is dismissed as to all defendants, but as with Counts One and Two, the dismissal is without prejudice.

### 5. Count Four—Section 1983

Section 1983 imposes civil liability upon any person who, under color of·law, deprives another person of his constitutional rights, privileges, or immunities. 42 U.S.C. § 1983. In Count Four, Copeland invokes section 1983, alleging that (1) Northwestern and the unknown nurse and physicians arrested Copeland without a warrant, interrogated him without the benefit of counsel, and jailed him by placing him in a locked observation room, all without probable cause or judicial process; (2) the City and the two unknown police officers directed the actions of Northwestern, the nurse, and the physicians, causing them to act under color of law, by commanding the arrest of Copeland without a warrant, his interrogation without the benefit of ·counsel, and his being jailed in a locked observation room, all without probable cause or judicial process; and (3) the City failed to train its police officers and, by extension, Northwestern, the nurse, and the physicians,

in making a warrantless arrest on behalf of the United States government.

Because Northwestern stands in different shoes than the City with respect to the "under color of law" requirement, the court will analyze the claims against the two separately.

#### a. Northwestern

Copeland alleges essentially that Northwestern, the nurse, and the physicians were acting under color of law when they arrested, interrogated, and jailed him at the hospital, without a warrant, probable cause, or judicial process.

■ Section 1983 generally does not extend to conduct of private individuals. *Letisha A. by Murphy v. Morgan,* 855 F.Supp. 943, 947 (N.D.Ill.1994) (citing *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 461–62, 102 L.Ed.2d 469 (1988)). However, a private individual may be subject to section 1983 liability if the individual "acted under color of state law by exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Letisha A.,* 855 F.Supp. at 947 (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)).

■ As throughout his complaint, Copeland makes bare assertions that Northwestern and the unknown nurse and physicians acted under the direction of the City, but fails to support the assertions with any facts. Moreover, the facts that are in Copeland's complaint are insufficient to allow the inference that Northwestern was acting under the authority of the City when it admitted Copeland to the hospital.

The only link between the hospital and the City, according to Copeland's complaint, is that the police officers went to the hospital to arrest Copeland, and the nurse told the officers that the hospital was holding Copeland for them. Copeland would have the court find that these facts suggest that the City and its police officers directed all of the preceding actions of the hospital and its staff.

But that inference simply cannot be drawn from the facts in Copeland's complaint. The facts just as easily suggest that the hospital and its staff became suspicious that Copeland may have robbed a bank, and on their own initiative, called the Chicago police.

In short, nothing in Copeland's complaint indicates that Northwestern was acting under color of state law "by exercising power 'possessed by virtue of state law and made possible only because [Northwestern was] clothed with the authority of state law.'" *Letisha A.*, 855 F.Supp. at 947 (quoting *Classic*, 313 U.S. at 326, 61 S.Ct. at 1043). Since Northwestern was not acting under color of state law, it cannot be liable under section 1983.

■ Moreover, even if Northwestern and the nurse and physicians were acting under color of state law when they engaged in the actions of which Copeland complains, Copeland's allegations preclude a section 1983 claim against Northwestern; the allegations establish that Northwestern and its staff members did not arrest, interrogate, or jail Copeland.

According to Copeland's complaint, it was Copeland who presented himself to the hospital's emergency room seeking medical treatment. Copeland was complaining about a blackout that preceded a cocaine binge and resulting psychological trauma, and wanted psychiatric treatment. The registration nurse questioned Copeland about the circumstances leading up to his seeking hospital admission. He voluntarily answered her questions.

Once he was admitted, Copeland was put in a locked observation room. Copeland does not allege that at that time, he believed he was in official custody. Copeland does not allege that he tried to leave the room or asked to be released from the room. Instead, his complaint shows that he remained there voluntarily, awaiting treatment. Eventually, a doctor with some students entered the observation room. The doctor asked if he could ask Copeland some questions, and Copeland agreed. The doctor questioned Copeland about his condition, then left. Some time later, the two Chicago police officers entered the room and took Copeland into custody.

Thus, the complaint makes clear that the hospital did not "arrest" or "jail" Copeland, or otherwise detain him against his will. Copeland voluntarily sought help at the hospital, and after his admission, never sought to be released from the hospital.

■ Moreover, because Copeland was never in the custody of the hospital, he could not have been interrogated by the hospital's staff members in violation of his constitutional rights. Custodial interrogation is any questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in a significant way. *United States v. James*, 113 F.3d 721, 725–26 (7th Cir.1997) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)). Custody "'implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of custody is coercion.'" *James*, 113 F.3d at 726 (quoting *United States v. Martin*, 63 F.3d 1422, 1429 (7th Cir.1995)).

■ "Furthermore, 'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *James*, 113 F.3d at 726 (quoting *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994)). "In other words, 'the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation.'" *James*, 113 F.3d at 726 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).

■ Any questioning of Copeland by hospital staff members was done in the course of admitting Copeland to the hospital and determining Copeland's condition. No reasonable person in Copeland's position would have believed himself to be in custody of the government, but rather would have understood himself to be in a hospital to which he chose to go for medical and psychiatric treatment.

Moreover, no reasonable person would believe that the nurse and doctor were government agents, and that he was being coerced to answer the questions of the nurse and doctor and was not free to end his conversations with them. In fact, Copeland's complaint makes clear that he voluntarily answered the nurse's questions and expressly agreed to answer the doctor's questions.

Therefore, because Copeland was never in custody of the hospital, the hospital staff members' questioning of Copeland was not a "custodial interrogation" that implicated constitutional rights.

The hospital's and its staff members' actions were not taken under color of law and did not constitute the arrest, interrogation, or jailing of Copeland. Accordingly, Copeland has no claim against Northwestern under section 1983, and Count Four is dismissed as to Northwestern. Furthermore, because the allegations of Copeland's complaint preclude a section 1983 claim against Northwestern, the dismissal is with prejudice.

b. *The City*

Copeland claims that the City is liable to him under section 1983 because it deliberately and consciously failed to train its police officers, including the two police officer defendants, and by extension, Northwestern and its nurse and physicians, in making a warrantless arrest on behalf of the United States.[5] The court assumes that Copeland is attempting to allege that the City maintained a policy of not training its officers in making warrantless arrests.

■■■■■ A local government is liable under section 1983 only where the execution of an official government policy or custom causes the alleged constitutional injury. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *see also Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 734 (7th Cir.1994). A municipality may maintain such a policy ex-

pressly; through custom or usage; or through the acts of a person with final policy-making authority. *See Baxter*, 26 F.3d at 734–35. Moreover, the enforcement of the government's policy must be the "moving force" behind the alleged constitutional violation. *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir.1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion)).

■■■■ It appears that Copeland is attempting to allege that the City maintains a *de facto* policy through custom or usage regarding warrantless arrests. However, his claim consists solely of conclusory, boilerplate assertions of such a policy, unsupported by any factual allegations.

■■■■ "Claims based wholly on conclusory allegations of a *de facto* municipal policy, constitute one of the most prevalent forms of abuse in § 1983 actions." *Boyd v. Venticinque*, No. 93 C 6108, 1994 WL 516747, *2 (N.D.Ill. Sept.19, 1994) (citing *Rodgers v. Lincoln Towing Service, Inc.*, 596 F.Supp. 13, 20 (N.D.Ill.1984), *aff'd*, 771 F.2d 194 (7th Cir.1985)). A section 1983 claim based on a policy or practice must contain factual allegations that indicate a specific, existing policy or practice that caused the deprivations alleged in the complaint. *Bennett v. Holman*, No. 95 C 2472, 1995 WL 616817, *2 (N.D.Ill. Oct.17, 1995) (citing *McTigue v. City of Chicago*, 60 F.3d 381, 382–83 (7th Cir.1995) (citing *Baxter*, 26 F.3d at 736)).

Copeland's policy claim amounts to a boilerplate assertion that the City has a policy of failing to train its officers in the ways of conducting lawful arrests. Copeland provides no details of this alleged policy to support his claim in any way. For this reason, he fails to state a claim against the City under section 1983 for failure to train. *See id.* (plaintiff "must point to a specific custom or policy . . . and describe how it operated in

---

5. Copeland also alleges that the City directed the actions of Northwestern in arresting, interrogating, and jailing him. As the court already discussed, the City did not direct the actions of

Northwestern, and Northwestern did not arrest, interrogate, or jail Copeland. Thus, this allegation is without merit.

this instance to deprive him · of his civil rights").

As the Seventh Circuit has noted,

"[b]oilerplate allegations of a municipal policy, entirely lacking in any factual support that a [municipal] policy does exist, are insufficient.... The absence of any facts at all to support plaintiff's claim renders the allegations mere legal conclusions of section 1983 liability devoid of any well-pleaded facts."

*McTigue,* 60 F.3d at 382–83 (quoting *Baxter,* 26 F.3d at 736 (citations omitted)). In the "absence of any facts at all to support" Copeland's claim that the City maintained a policy of failing to train its police officers in the ways of making lawful arrests, Copeland's allegations are "mere legal conclusions of section 1983 liability devoid of any well-pleaded facts." *Id.*

Consequently, Copeland has not stated a section 1983 claim against the City based on its alleged failure to train its police officers, and Count Four is dismissed against the City. However, since Copeland may be able to cure the defects in Count Four as to the City, the dismissal is without prejudice.

### 6. Count Five—Section 1986

Section 1986 imposes civil liability on any person who had knowledge of a section 1985 conspiracy and power to prevent or aid in preventing the conspiracy but neglected or refused to do so. 42 U.S.C. § 1986.

In Count Five, Copeland alleges that the City and its two police officers, through communication with Harbaugh and Pena, had knowledge of the various section 1985 conspiracies alleged by Copeland and had power to prevent the overt acts constituting the bases of the conspiracies, and neglected or refused to prevent the section 1985 conspiracies.

■ A section 1986 claim is strictly derivative of a section 1985 claim; if no section 1985 claim exists, no section 1986 claim exists. *See D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474, 1485 n. 16 (7th Cir.1985) (citing *Williams v. St. Joseph Hosp.,* 629 F.2d 448, 452 (7th Cir.1980); *Tomkins v. Village of Tinley Park,* 566 F.Supp. 70, 80 (N.D.Ill.

1983)). In this case, the court already has found that Copeland has failed to state claims under section 1985 against defendants. Thus, he has no claim under section 1986 against defendants.

More important, though, section 1986 has a one-year statute of limitations. *See* 42 U.S.C. § 1986. Copeland filed his complaint two years after the alleged wrongs occurred. Thus, his section 1986 claim was filed long after the limitation period passed. Accordingly, while none of the defendants raised the issue, the court finds that Copeland's section 1986 claim must be dismissed with prejudice as it was filed outside of the applicable limitation period.

### 7. Count Six—Medical malpractice

In Count Six, Copeland brings a medical malpractice claim against Northwestern, two nurses, and two physicians. Copeland alleges that those defendants caused him psychological injury when they lied to him that they were admitting him to the hospital for treatment but instead arrested him and did not provide the treatment that he had requested. Copeland also alleges that those defendants violated his privacy rights by disclosing privileged psychotherapist-patient communications to the Chicago Police Department and/or United States government, thereby causing him psychological injury.

■ Copeland's medical malpractice is governed by Illinois law. As an initial matter, the court notes that Copeland has failed to plead any of the elements of a cause of action for medical malpractice in Illinois. *See Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co.,* 758 F.2d 203, 207 (7th Cir.1985) ("a complaint must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory"). For this reason, Count Six fails to state a medical malpractice claim.

■ Furthermore, even if Copeland properly had alleged a medical malpractice claim, he has failed to comply with the statutory requirements for filing a medical malpractice action. With his · complaint, Copeland was required to file an affidavit of merit

and a health care professional's report attesting that in his or her opinion, a "reasonable and meritorious cause" for filing the action exists. 735 ILCS 5/2–622(a). Failure to file the documents required by section 2–622 is cause for dismissal under 735 ILCS 5/2–619. 735 ILCS 5/2–622(g).

Copeland has failed to submit the documents required by 735 ILCS 5/2–622. However, he has moved to subpoena the records of two psychiatrists that Copeland saw while incarcerated at the MCC. Copeland claims that he saw these psychiatrists for the purpose of having either or both supply the documents required by 735 ILCS 5/2–622. Copeland also has submitted a psychiatric evaluation by Dr. Philip Pan, who evaluated Copeland's mental state at the time of his crime, presumably for Copeland's defense attorney in his criminal prosecution. Copeland asks the court to allow those records to substitute for the required affidavit.

These records do not constitute the affidavit or report required by 735 ILCS 5/2–622. Dr. Pan's evaluation does not even concern Copeland's medical malpractice claim. Therefore, the court will not allow those records to substitute for the required affidavit.

Accordingly, Count Six is dismissed without prejudice for failure to state a claim.

### C. *Summary*

Copeland's complaint is replete with conclusory statements regarding defendants' alleged wrongs, but utterly lacking the factual allegations necessary to support Copeland's conclusions. Accordingly, the complaint is dismissed in its entirety for failure to state any claims upon which the court can grant relief. *See* FED.R.CIV.P. 12(b)(6). Because Count Four against Northwestern and Count Five against all defendants cannot be cured by repleading, Count Four is dismissed with prejudice as to Northwestern and Count Five is dismissed with prejudice as to all defendants. Because the remaining counts suffer from a lack of allegations, rather than from affirmative allegations that defeat the claims, it is conceivable that Copeland can cure the defects by repleading. Therefore, those counts are dismissed without prejudice. The court will allow Copeland an opportunity to amend his complaint to state valid legal claims, as well as to submit the required documents with his medical malpractice claim.

Copeland is given 10 days from the date of this order to amend his complaint in accordance with this order. If he fails to do so, his cause of action will be dismissed with prejudice.

### III. *CONCLUSION*

The court strikes Copeland's motions for leave to request initial disclosures, production of documents, and admissions of facts, and for an enlargement of time; and denies Copeland's motions for issuance of a subpoena, summary judgment against Pena, production of transcripts, and substitution of parties.

On its own motion, the court dismisses Copeland's complaint against the unknown defendants, and dismisses with prejudice the unknown defendants as party defendants.

The court grants defendants' motions to dismiss Copeland's complaint, and dismisses Count Four against Northwestern and Count Five against all defendants with prejudice, and the remaining counts of the complaint without prejudice, and with leave to amend, as set forth in this opinion.